

FILED

Jul 22 2016, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Joel Schumm
Appellate Clinic
Indiana University
Robert H. McKinney School of Law
Indianapolis, Indiana

Lawrence C. Marshall
Stanford Law School
Stanford, California


ATTORNEYS FOR AMICI CURIAE

ASIAN PACIFIC AMERICAN WOMEN'S
FORUM AND CENTER ON REPRODUCTIVE
RIGHTS AND JUSTICE AT THE UNIVERSITY
OF CALIFORNIA, BERKELEY, SCHOOL OF
LAW, ET AL.

Laura Paul
Indianapolis, Indiana

Jill E. Adams
Melissa A. Mikesell
Center on Reproductive Rights and
Justice
University of California, Berkeley
School of Law
Berkeley, California


ASIAN-AMERICAN AND PACIFIC ISLANDER
ORGANIZATIONS IN SUPPORT OF
APPELLANT

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

Grace B. Atwater
Kammen & Moudy
Indianapolis, Indiana


THE INNOCENCE NETWORK AND DR.
GREGORY J. DAVIS

Julie D. Cantor
Santa Monica, California

Linda L. Pence
Pence Hensel LLC
Indianapolis, Indiana


NATIONAL ADVOCATES FOR PREGNANT
WOMEN AND EXPERTS IN PUBLIC HEALTH,
HEALTH ADVOCACY, AND BIOETHICS

Lynn M. Paltrow
National Advocates for Pregnant Women
New York, New York

Katherine D. Jack
Law Office of Katherine Jack
Greenfield, Indiana


INTERNATIONAL WOMEN'S HUMAN
RIGHTS CLINIC, AMNESTY
INTERNATIONAL, AND THE CENTER FOR
REPRODUCTIVE RIGHTS

Cynthia Soohoo
International Women's Human Rights
Clinic
City University of New York Law School
Long Island City, New York

Sandra L. Blevins
Betz + Blevins
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Purvi Patel,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 22, 2016

Court of Appeals Case No.
71A04-1504-CR-166

Appeal from the St. Joseph
Superior Court

The Honorable Elizabeth C.
Hurley, Judge

Trial Court Cause No.
71D08-1307-FA-17

**Crone, Judge.**

## Case Summary

Thirty-two-year-old Purvi Patel managed her father's restaurant in Mishawaka. A relationship with a restaurant employee resulted in her pregnancy. In June 2013, she purchased mifepristone and misoprostol online from a Hong Kong pharmacy and used those drugs to terminate the pregnancy at home. On the evening of July 13, she delivered a live baby of approximately twenty-five to thirty weeks gestation who died shortly after birth. She drove to the restaurant, put the baby in a nearby dumpster, and drove herself to the emergency room.

The State charged Patel with class A felony neglect of a dependent, alleging that she failed to provide any medical care to her baby immediately after its birth, which resulted in its death. The State also charged Patel with class B felony

feticide, alleging that she knowingly terminated her pregnancy with the intention other than to produce a live birth or to remove a dead fetus. A jury found her guilty as charged. The trial court sentenced Patel to thirty years of imprisonment for neglect of a dependent, with twenty years executed and ten years suspended, and a concurrent executed term of six years for feticide.

[3] On appeal, Patel argues that her neglect of a dependent conviction should be overturned because it is not supported by sufficient evidence. She also argues that her feticide conviction should be overturned because the feticide statute is either inapplicable or unconstitutional as applied to her.

[4] As for the neglect conviction, we hold that the State presented sufficient evidence for a jury to find that Patel was subjectively aware that the baby was born alive and that she knowingly endangered the baby by failing to provide medical care, but that the State failed to prove beyond a reasonable doubt that the baby would not have died but for Patel's failure to provide medical care. Therefore, we vacate Patel's class A felony conviction and remand to the trial court with instructions to enter judgment of conviction for class D felony neglect of a dependent and resentence her accordingly.

[5] As for the feticide conviction, we hold that the legislature did not intend for the feticide statute to apply to illegal abortions or to be used to prosecute women for their own abortions. Therefore, we vacate Patel's feticide conviction.

Consistent with our well-settled standard of appellate review, we recite the relevant facts most favorable to the jury's verdicts. Patel was born in the United States to immigrants from India in September 1980. She lived in a home in Granger with her parents and paternal grandparents, and she managed Moe's, a restaurant in Mishawaka owned by her father. In approximately August 2012, Patel became involved in a sexual relationship with a married man[2] and did not use birth control. She did not mention the relationship to her parents, but she did share some details of the relationship via text messages with a friend from Michigan, medical assistant Felicia "Fay" Turnbo. Tr. A at 814.[3]

On April 15, 2013, thirty-two-year-old Patel texted Turnbo, "[C]ramps coming n going, my cycle is changing completely due to all the stress I been under lately so not sure when my period is coming but still feeling the pain[.]" State's Ex. 47 at 4. On April 19, she stated, "Man I'm cramping again…my period been so funny the last 2 mths cuz of my stress[.…] I spot n then stop. But cramps come n go…the cramps r the worst part." *Id.*

Just over a month later, on May 21, Patel stated, "I keep cramping bad but then my period won't start, driving me crazy! [.…] It's been like this for 2 weeks

---

[1] We heard oral argument on May 23, 2016. We thank the parties for their presentations.

[2] *See* State's Ex. 47 at 2 (mentioning man's wife).

[3] The trial was recorded by two court reporters, and the second reporter started renumbering the transcript at page 1. We refer to the first part of the transcript as "Tr. A" and the second part as "Tr. B."

now […] tired of the pain[.]" *Id.* Turnbo replied, "U might wanna go to the Dr[.]" *Id.* Patel responded, "[D]on't like docs lol! I think it's cuz of all the stress my body been goin thru physically n mentally[.]" *Id.*

[9] Two weeks later, on June 4, Patel told Turnbo that she had not had an appetite "for a while now" and indicated that she thought that she might be pregnant, but she "hope[d] not!!!!!!!!!" *Id.* at 5, 6. Turnbo asked, "Have u missed?" *Id.* at 6. Patel replied, "I been cramping like crazy tho for weeks now so I'm hoping its cuz of stress[.]" *Id.* Turnbo responded, "Take a test!!!!!" *Id.* Patel stated, "Hoping it all just goes away lol[.]" *Id.*

[10] On June 10, Patel took a pregnancy test. She informed Turnbo that it "didn't even take a min[ute] for it to show" that she was pregnant and that "[m]y Fam would kill me n him[.]" *Id.* at 8. Patel stated, "U already know I can't have it[.]" *Id.* Turnbo stated, "Now first we gotta get u to a dr. This may b[e] something that ur body is deciding on its own[.…] U can go to the urgent care place even and tell them that u took a test and it shows positive but u r cramping bad and spotting. They will do an ultrasound and let u know then we will go from there[.]" *Id.* at 8-9. Patel stated, "I rather not even go to a doc…just wanna get it over with[.]" *Id.* at 9. Turnbo replied, "I understand that but for ur health u should go to a dr first." *Id.*

[11] On June 16, Patel told Turnbo, "Btw I just realized today I've missed 2." *Id.* at 11. Turnbo replied, "You need to go to Dr. first[.]" *Id.* Patel stated, "Yeah I think we need to go this week[.]" *Id.* Instead of going to a doctor, however,

Patel performed a "good bit" of online research on medications for terminating pregnancies. *Id.* at 15. On June 19, Turnbo told Patel that a clinic in South Bend had "the pill for that" and estimated its cost at "between 300-400 or something like that." *Id.* at 12. Patel replied, "But it's only within 60 days…I might be over that[.]" *Id.* Later that day, Patel ordered mifepristone and misoprostol[4] online from a Hong Kong pharmacy for $72 and had the package shipped to Moe's so "no one [would] know[.]" *Id.* On June 27, Patel "vent[ed]" to Turnbo that she wanted her boyfriend and "the baby outta [her] life[.]" *Id.* at 14.

[12] On July 1, Patel told Turnbo, "My package came[.]" *Id.* On July 3, Patel stated that she would wait until after she returned from a trip to Chicago to take the medications because she "[didn't] wanna be in pain cramping all weekend while [she had to] meet with vendors[.]" *Id.* at 15. One week later, on July 10, Patel told Turnbo that, in accordance with her online research, she would take one mifepristone pill that morning and two misoprostol pills one to three days later, and "if it doesn't work then 2 more [misoprostol] after 4 hrs[.] If this

---

[4] According to OB/GYN Dr. Kelly McGuire, mifepristone, also known as RU-486, is a "progesterone antagonist" most commonly used for "first trimester abortions" and is "approved […] up until 49 days of gestation[,]" presumably by the FDA. Tr. B at 550. It "attack[s] the placental tissue and by attacking the placental tissue, it indirectly would kill the baby." *Id.* Misoprostol, also known as cytotec, is "used to cause uterine contractions" and "induce labor[.]" *Id.* at 551. In response to a question from the State, Dr. McGuire testified that only a doctor may administer or prescribe misoprostol. *Id.* at 581-82. He was not asked the same question about mifepristone.

doesn't work then we will have to take a trip[.]" *Id*. At 10:34 a.m., Patel told Turnbo that she had taken the mifepristone.

[13]    At 5:22 p.m. on July 11, Patel told Turnbo that she had taken two misoprostol pills. Over the next two days, Patel experienced "horrible cramps" and intermittent bleeding. *Id*. at 17. On the evening of July 12, Patel told Turnbo that she would take another misoprostol pill the following evening "to give it extra time[.]" *Id*. at 20. That same evening, Patel visited a webpage entitled "National Abortion Federation: Abortion after Twelve Weeks." State's Ex. 50. At 3:44 p.m. on July 13, Patel told Turnbo that she had "[b]een home in bed since" 12:30 p.m. State's Ex. 47 at 20. At 7:07 p.m., Patel told Turnbo that she was trying to go to the hospital "but [couldn't] get off the bed to get dressed[.]" *Id*. at 21. Turnbo promptly replied, "U need to go." *Id*. At 7:37 p.m., Turnbo asked Patel, "R u going to go?" *Id*. At 7:42 p.m., Patel replied, "Want to but can't drive." *Id*.

[14]    At 8:11 p.m., Patel told Turnbo, "Just lost the baby[.]" *Id*. Less than three minutes later, Patel stated, "Imma clean up my bathroom floor n then go to Moes[.]" *Id*. Turnbo asked, "Was it still a clot or starting to form?" *Id*. Patel replied, "Starting to form a lil[.] More so big clots tho[.]" *Id*. In fact, Patel had delivered a baby boy measuring thirty-one centimeters (approximately one foot) long and weighing 660 grams (slightly less than one and a half pounds).

[15]    Patel cut the umbilical cord and placed the baby in a plastic shopping bag containing bathroom trash and an airline boarding pass with Patel's name. She

was unable to remove "a piece of the cord hanging from [her]" and "ke[pt] bleeding thru her clothes[,]" so she drove herself to St. Joseph Regional Medical Center in Mishawaka. *Id.* at 21, 22. En route, she stopped at Moe's and put the bag containing the baby into a dumpster.

[16] At 9:23 p.m., Patel was admitted to the emergency room ("ER") with "a substantial amount of bleeding" and "an umbilical cord hanging out of the vaginal area." Tr. A at 316. She continued to exchange texts with Turnbo throughout the evening. Patel told the ER staff that she had been ten to twelve weeks pregnant, had missed two menstrual periods, and had "just passed clots." *Id.* at 354. Based on the size of the umbilical cord and a physical examination of Patel, however, OB/GYN Dr. Tracy Byrne estimated that Patel had been twenty-eight to thirty weeks along, and OB/GYN Dr. Kelly McGuire estimated that she had been at least twenty-five or twenty-six weeks "or beyond." *Id.* at 521. Both doctors determined that "there had to have been a baby" and questioned Patel, who finally acknowledged that she had given birth to a baby and stated that she had put it in a paper bag and placed it in a dumpster behind a Target store. *Id.* at 355. Because "[i]t was a warm night and based on the size of the umbilical cord[,]" Dr. McGuire "thought that [they] could find a baby that was far enough along that could still be alive" and left the hospital to search for it. *Id.* at 549.

[17] Law enforcement officers were notified and searched a dumpster behind the Target store, to no avail. Patel was asked for more specific information regarding the baby's location, and she ultimately revealed that she had put the

baby in a plastic bag and placed it in a dumpster to "the left of Target," which is near Moe's. *Id*. at 366. Officers searched dumpsters in that area and finally found the plastic bag containing Patel's baby at 12:06 a.m.

[18] At that point, Dr. McGuire had been participating in the search for approximately thirty to forty-five minutes. When he was informed that the baby had been found nearby, he went to the scene and removed the baby from the bag, which "was sealed shut from the blood." *Id*. at 542. "The baby was cold and lifeless" but "was an otherwise normal, healthy appearing baby" with no signs of trauma. *Id*. at 544. His "rough estimate" was that "the baby was about 30 weeks along[,]" and he would have expected a baby at that developmental stage to exhibit "movement, possibly crying" upon birth. *Id*. at 546, 548. He believed that the baby was viable "[d]espite the fact that it was not born in a hospital setting[.]" *Id*. at 549.

[19] An ultrasound revealed that Patel's uterus was full of blood. She underwent surgery to remove the placenta[5] and was interviewed by police at the hospital. Patel stated that she had always had irregular menstrual cycles and had taken a pregnancy test three weeks ago after missing a couple periods. She stated that she was suffering from cramps in her bedroom and felt a strong urge to urinate, and that "everything came out" on the bathroom floor "like [she] had no

---

[5] Pathologist Dr. Bobbie Sutton testified that the placenta weighed 231 grams, which "falls right in that mean placental weight or average placental weight for about 26 to 27 weeks gestational age which is right at about the end of the second to early third trimester." Tr. B at 90.

control over it" before she reached the toilet. State's Ex. 62 (video of interview). She stated that the baby did not cry after delivery and that she did not attempt CPR because it was not moving. She claimed that she tried to "open the baby's mouth and move it, and it was just a small little limpless body." *Id.* Patel also claimed that she had taken only pain medication, that the pregnancy was the result of a "random hookup," and that she had been "excited" about having a baby. *Id.*

[20] A search warrant was obtained for Patel's house. Police found blood on her bedroom floor and bathroom floor as well as on a towel, a bath mat, and a pair of underwear. DNA testing on blood samples taken from the boarding pass and the bath mat indicated that the baby could not be excluded as one of the two contributors to the samples. On Patel's iPad, police found a customer service email from InternationalDrugMart.com, from which a detective was able to order and receive one mifepristone pill and four misoprostol pills without a prescription. State's Exs. 49, 53, 54.

[21] Forensic pathologist Dr. Joseph Prahlow performed an autopsy on Patel's baby, which revealed no external or internal abnormalities. Based on various weights and measurements of the body and organs, as well as an examination of the organs both inside the body and under a microscope, Dr. Prahlow concluded that the baby was of approximately twenty-five weeks gestation, "more likely than not" was born alive, and had breathed after it was born. Tr. B at 411. For

purposes of this appeal, Patel has stipulated that the baby was born alive.[6] The umbilical cord showed no abnormalities, and the baby showed no signs of maceration (breaking down of tissue after death in utero) or decomposition. According to Dr. Prahlow, the manner of death was homicide, and the possible mechanisms of death were "extreme prematurity" coupled with a lack of essential medical care, hypothermia or hyperthermia due to the baby's inability to regulate its body temperature, loss of blood due to the severed umbilical cord, or asphyxia from being placed in a plastic bag or from items inside the bag that could cover its mouth and nose. Tr. A at 1015, 957. Dr. Prahlow was unable "to draw even a very, very small amount [of the baby's blood] into a test tube for toxicology purposes[,]" which he attributed to the umbilical cord being severed and "not clamped off or tied off in any way." *Id*. at 929-30. He testified that "[a]s long as the heart is beating and moving blood, then bleeding can occur. Once the heart stops […] beating, then the blood loss would be very minimal." *Id*. at 934.

---

[6] Amici The Innocence Network and Dr. Gregory J. Davis challenge Dr. Prahlow's conclusion that Patel's baby was born alive, focusing primarily on the reliability of the lung flotation test performed during the autopsy. Dr. Prahlow acknowledged that the test is "necessarily unreliable all by itself" but stated that it "can be part of an entire equation that leads to a conclusion that a baby breathed after birth." Tr. A at 947. He testified that the baby's lungs were "spongy," "felt like they had air in them, just touching them," and "substantially filled" the "pleural spaces" in the chest cavity, which "is an indication that there is air in the lungs." *Id*. at 939. He further testified that "the bronchioles or the air tubes as well as the alveoli, the air [sacs], were consistent microscopically with being aerated as well." *Id*. at 948. According to Dr. Prahlow, the baby's lungs also contained "fairly large blood vessels" that were "filled with blood," which occurs when a baby breathes. Tr. B at 396-97. And finally, he testified that he had "done [his] share" of autopsies of "discarded newborn infants […] over the years" and that this was "the first case" where he "felt confident enough in [his] findings to say [he believed] that this baby was born alive, meaning that it breathed." Tr. A at 1024. Because Patel does not challenge the admissibility of Dr. Prahlow's testimony and has stipulated that her baby was born alive, the amici's argument is moot.

On July 17, 2013, the State charged Patel with class A felony neglect of a dependent, alleging that she failed to provide any medical care to her baby immediately after its birth, which resulted in its death. In August 2014, the State amended the charging information to add a charge of class B felony feticide, alleging that Patel knowingly terminated her pregnancy with the intention other than to produce a live birth or to remove a dead fetus. A jury trial was held from January 23 to February 3, 2015. The jury found Patel guilty as charged. In March 2015, the trial court sentenced Patel to thirty years of imprisonment for neglect of a dependent, with twenty years executed and ten years suspended, and a concurrent executed term of six years for feticide. Patel now appeals her convictions but does not challenge the appropriateness of her sentence.[7] Additional facts will be provided as necessary.

## Discussion and Decision

## Section 1 – The State failed to prove beyond a reasonable doubt that Patel committed class A felony neglect of a dependent.

In July 2013, when the relevant events occurred, the neglect statute read in pertinent part as follows:

---

[7] *See* Ind. Appellate Rule 7(B) ("The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.").

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
>> (1) places the dependent in a situation that endangers the dependent's life or health;
>>
>> …
>
> commits neglect of a dependent, a Class D felony.
>
> (b) However, the offense is:
>
>> …
>>
>> (3) a Class A felony if it is committed under subsection (a)(1) … by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age[.]

Ind. Code § 35-46-1-4. A class D felony carries a sentencing range of six months to three years, with an advisory sentence of one and a half years. Ind. Code § 35-50-2-7. A class A felony carries a sentencing range of twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4.

[24] The charging information alleged that Patel,

> who is more than eighteen (18) years old, and having the care of a dependent, did knowingly place that dependent in a situation that endangered the dependent's life or health by failing to provide any medical care for that dependent immediately after

the dependent's birth, resulting in the death of that dependent, who was less than fourteen (14) years old.

Appellant's App. at 201. To establish that Patel knowingly placed her dependent in a dangerous situation, the State was required to prove that she was "aware of a high probability" that she was doing so. Ind. Code § 35-41-2-2(b).

## Section 1.1 – Standard of review

[25] Patel asserts that the State failed to present sufficient evidence to sustain her conviction. "When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict." *Miller v. State*, 916 N.E.2d 193, 198 (Ind. Ct. App. 2009), *trans. denied* (2010). "We do not reweigh the evidence or judge the credibility of the witnesses, and we respect the jury's exclusive province to weigh conflicting evidence." *Keller v. State*, 987 N.E.2d 1099, 1117 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, when confronted with conflicting evidence, we consider it most favorably to the jury's verdict. *See Miller*, 916 N.E.2d at 198. "To sustain a conviction under a sufficiency of the evidence challenge, there must be sufficient evidence on each material element of the offense." *Ferrell v. State*, 746 N.E.2d 48, 51 (Ind. 2001). We will "affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. The evidence need not overcome every reasonable hypothesis of innocence." *Miller*, 916 N.E.2d at 198-99 (citation omitted).

"Although this standard of review is deferential, it is not impossible, nor can it be." *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010). Article 7, Section 6 of the Indiana Constitution guarantees "in all cases an absolute right to one appeal." "An impossible standard of review under which appellate courts merely 'rubber stamp' the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory." *Id*. "While we seldom reverse for insufficient evidence, in every case where that issue is raised on appeal we have an affirmative duty to make certain that the proof at trial was, in fact, sufficient to support the judgment beyond a reasonable doubt." *Bean v. State*, 818 N.E.2d 148, 150 (Ind. Ct. App. 2004). "[T]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." *Pickens v. State*, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001). "'A reasonable inference of guilt must be more than a mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla.'" *Willis v. State*, 27 N.E.3d 1065, 1068 (Ind. 2015) (quoting *Mediate v. State*, 498 N.E.2d 391, 393 (Ind. 1986)) (alteration in *Willis* omitted).

## Section 1.2 – The State presented sufficient evidence for a jury to find that Patel was subjectively aware that the baby was born alive.

Regarding the specific elements of the neglect charge, Patel concedes that she was over eighteen years old and that her baby was less than fourteen years old and born alive and therefore a dependent for purposes of the neglect statute. *See Herron v. State*, 729 N.E.2d 1008, 1010 (Ind. Ct. App. 2000) (holding that an

unborn child is not a dependent for purposes of the neglect statute), *trans. denied*. Her sufficiency argument proceeds from our supreme court's holding in *Armour v. State* that "the level of culpability required when a child neglect statute requires knowing behavior is that level where the accused must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation." 479 N.E.2d 1294, 1297 (Ind. 1985). Thus, Patel contends, the first question that must be answered is whether the State presented sufficient evidence "to support a finding (even by inference) that [she] had actual awareness there was a live infant." Appellant's Br. at 18; *see Fout v. State*, 575 N.E.2d 340, 342 (Ind. Ct. App. 1991) ("Normally a defendant's subjective awareness requires resort to inferential reasoning to ascertain a mental state.").

[28] We conclude that it did. The evidence most favorable to the jury's verdict establishes that the baby took at least one breath and that its heart was beating after delivery and continued to beat until all of its blood had drained out of its body. *See* Tr. A at 958, 929-30, 934 (Dr. Prahlow's testimony). It is true, as Patel states, that Dr. Prahlow acknowledged that there was no way to determine how many breaths the baby took. *Id*. at 1017. But Dr. McGuire testified that, based on his observations of the baby and his training and experience, he would have expected it to exhibit "signs of life upon birth" such

as "movement, possibly crying." *Id*. at 548.[8] Patel notes that Dr. McGuire estimated that the baby was of approximately thirty weeks gestation and never opined whether a baby of twenty-five weeks gestation (per Dr. Prahlow's estimate) would exhibit signs of life. It was exclusively within the jury's province to credit Dr. McGuire's testimony regarding the baby's gestational age and attributes based on his observations, training, and experience. *Cf. Robinson v. State*, 894 N.E.2d 1038, 1042 (Ind. Ct. App. 2008) (affirming class A felony neglect conviction and finding sufficient evidence that baby was born alive based on doctors' testimony "and all of the evidence relied upon by these experts").

---

[8] Patel asserts that Dr. McGuire testified that "only neonatologists have the expertise to testify about these first moments following birth of a severely premature infant." Appellant's Br. at 21 n.5 (citing Tr. A at 510, 564). Dr. McGuire actually stated, "[W]hen we deliver the babies as obstetricians, we deliver the babies and in these premature cases, then we're going to hand them off to a neonatologist for care and then we'll follow along to find out how the babies did[.]" Tr. A at 510. He also stated that a question regarding the treatment "issues" presented by a baby of twenty-four weeks gestation would be "better directed to a neonatologist." *Id*. at 564. In any event, Patel did not object to Dr. McGuire's testimony on this basis at trial and therefore has waived any claim of error on appeal. *See Lanham v. State*, 937 N.E.2d 419, 423 (Ind. Ct. App. 2010) ("The failure to object at trial to the admission of evidence results in waiver of that issue on appeal.").

[29]	Patel also cites testimony that allegedly proves that the baby would have bled to death in less than a minute through the severed umbilical cord.[9] The State points out that "this would have occurred only after the cord was cut and not clamped, so it did not necessarily occur in the baby's first minute of life." Appellee's Br. at 23 n.9. There is no indication that anyone other than Patel cut the cord, and we agree with the State that "it defies credulity to suppose that [Patel] was oblivious" to a foot-long baby "exiting from her body[.]" *Id*. at 24. In fact, Patel told the police that she tried to open the baby's mouth, from which the jury could have found that she got a good look at the baby up close.[10] And the jury could have considered Patel's false statements to Turnbo and others regarding her pregnancy, delivery, and disposal of the baby as evidence

---

[9] Dr. Prahlow testified that a baby the size of Patel's would have approximately twenty-five to fifty milliliters of blood in its body (roughly the volume of a shot glass) and that a person could go into shock and die after rapidly losing twenty-five percent of his blood. Tr. A at 932, 992. Patel's counsel questioned Dr. Prahlow about the "rate of blood flow through the umbilical cord[.]" *Id*. at 976. Counsel stated that he "looked it up in an article called Fetal Circulation …. in a magazine called Prenatal Diagnosis[,]" which purportedly gave a rate of thirty-five milliliters per minute for a fetus of twenty weeks gestation, and asked Dr. Prahlow if that "sound[ed] about right[.]" *Id*. Dr. Prahlow replied, "I have no reason to doubt that but I'd probably like to look at the article, et cetera." *Id*. at 977. Dr. Prahlow ultimately testified that he was not familiar with that publication and did not "have any independent verification" that it was relied on by professionals. *Id*. at 982. In her brief, Patel cites several facts and figures regarding fetal blood circulation and blood loss that were not presented to the jury at trial. Appellant's Br. at 18-19 n.3. *Cf. Jackson v. Virginia*, 443 U.S. 307, 318 (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether *the record evidence* could reasonably support a finding of guilt beyond a reasonable doubt.") (emphasis added). The State also relies on extrarecord sources regarding fetal viability in its brief. Appellee's Br. at 28.

[10] For this reason, Patel's reliance on *Taylor v. State*, 28 N.E.3d 304 (Ind. Ct. App. 2015), *trans. denied*, is misplaced. In *Taylor*, the State failed to prove that the mother subjectively became aware that her sleeping one-year-old son needed medical care before he died. *See id*. at 309 ("In this instance, the jury simply was not provided evidence that Taylor inflicted an injury, was present when injury was inflicted, heard the infliction of injury, or saw manifestations of an injury necessitating medical care. Although Taylor conceivably or hypothetically could have seen an injury of such severity that immediate medical care would be warranted, there is no evidence that she did so.").

of guilty knowledge that the baby was born alive. *See Grimes v. State*, 450 N.E.2d 512, 521 (Ind. 1983) ("Any testimony tending to show an accused's attempt to conceal implicating evidence or to manufacture exculpatory evidence may be considered by the trier of fact as relevant since revealing a consciousness of guilt."). In sum, Patel's argument on this point is an invitation to reweigh evidence, draw inferences, and reassess witness credibility in her favor, which we may not do.[11] The State presented sufficient evidence for a jury to find that Patel was subjectively aware that the baby was born alive.

## Section 1.3 – The State presented sufficient evidence for a jury to find that Patel endangered her baby by failing to provide medical care.

[30] Next, Patel contends that the State failed to prove beyond a reasonable doubt that she actually endangered the baby by failing to provide any medical care immediately after its birth. "To endanger is to bring into danger." *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985). "The placement must itself expose the dependent to a danger which is actual and appreciable." *Id.* "When there

---

[11] Patel claims that she had a "hazy eye" and "staggered into the bathroom" during the birthing process. Appellant's Br. at 19, 20. Yet she fails to acknowledge that she was able to text a running commentary to Turnbo, cut the umbilical cord, attempt to clean the bathroom floor, drive herself to Moe's, dispose of the baby, and drive herself to the ER. Moreover, Dr. George Drew testified that Patel did not "appear to be in danger of passing out or comatose" when she arrived at the ER. Tr. A at 339. Patel also claims that she "believed she was only 10- to 12-weeks pregnant" and thus "there is no reason to assume that she would have immediately inspected … what she was sure was a 10- to 12-week-old undeveloped fetus." Appellant's Br. at 20. Although the jury is always free to disregard a self-serving claim, Patel's text messages indicating that her menstrual patterns had been abnormal since February, her acknowledgement in June that she could have been pregnant for over sixty days, her perusal of a webpage entitled "Abortion after Twelve Weeks," and her false statements to Turnbo and others provide affirmative evidence to the contrary.

are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent." *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind. 2000), *abrogated on other grounds by Beattie v. State*, 924 N.E.2d 643 (Ind. 2010).

[31]     More specifically, Patel asserts that

> the prosecution needed to prove, as an objective matter, the Information's allegation that by not "providing medical care immediately following the birth of the dependent," [she] exposed the baby to danger—*i.e.*, enhanced the risk the baby would die. And it had to prove, as a subjective matter, that [she] had actual awareness of that risk.

Appellant's Br. at 22.

[32]     The evidence favorable to the jury's verdict was sufficient for a reasonable factfinder to conclude that Patel's failure to provide medical care actually endangered her significantly premature baby, who weighed less than two pounds and was bleeding from its severed umbilical cord.[12]  Patel's argument that the State failed to prove that she was actually aware of the danger is yet another invitation to reweigh the evidence, which we must decline.  The State

---

[12] Patel cites no authority for her suggestion that the State was required to prove, for purposes of establishing endangerment, that the medical care would "have made any difference."  Appellant's Br. at 22.  Neither the neglect statute nor caselaw imposes such a requirement.

presented sufficient evidence for a jury to find that Patel endangered her baby by failing to provide medical care.

## Section 1.3 – The State failed to prove beyond a reasonable doubt that Patel's failure to provide medical care resulted in the baby's death.

[33] By proving that Patel endangered her baby by failing to provide medical care after its birth, the State established that she committed neglect of a dependent as a class D felony. But to convict Patel of a class A felony, the State also had the burden to prove beyond a reasonable doubt that her failure to provide medical care resulted in the baby's death. We agree with Patel that the State failed to carry this burden.

[34] This Court has not been called upon to interpret the phrase "results in the death of a dependent" for purposes of the neglect statute, but caselaw suggests, and both parties agree, that this language implicates proximate causation. *See Abney v. State*, 766 N.E.2d 1175, 1177-78 (Ind. 2002) (defendant was convicted of operating motor vehicle while intoxicated, a class C felony if it "results in the death of another person"; court held that "the State must prove the defendant's conduct was a proximate cause of the victim's injury or death" and rejected lesser standard of "contributing cause"); *Mallory v. State*, 563 N.E.2d 640, 643 (Ind. Ct. App. 1990) (defendant was convicted of class B felony neglect of a dependent resulting in serious bodily injury, i.e., death; court held that evidence was sufficient to establish that "the death of the dependent arose as a consequence of" defendant's deprivation of support), *trans. denied* (1991). In the

civil context, our supreme court has explained that, "[a]t a minimum, proximate cause requires that the injury would not have occurred but for the defendant's conduct." *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003). Thus, the State was required to prove beyond a reasonable doubt that the baby's death would not have occurred but for Patel's failure to provide medical care immediately after its birth. *See* WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.2(d) (2d ed.) ("Legal or 'proximate' cause, at the very least, requires a showing of 'but for' causation: but for the omission the victim would not have died. Failure on the part of a parent to call a doctor for a sick child may often make the parent criminally liable for the child's death; but only if the doctor could have saved it, not if it would have died in spite of medical attention. It is apparent that this is a matter which often is not susceptible of easy proof, and convictions have sometimes been reversed because of what the appellate court viewed as less than adequate proof of causation.") (footnotes omitted).

[35]    In *Bergmann v. State*, 486 N.E.2d 653 (Ind. Ct. App. 1985), the defendants' nine-month-old daughter contracted bacterial meningitis and died approximately eleven days later. The defendants never sought medical care and were convicted of reckless homicide and class B felony neglect of a dependent. At trial, the State asked the coroner whether, "within the bounds of reasonable medical certainty," the child would have died if she had been "timely medically treated." *Id.* at 657. The coroner opined that the child "would have had a very good chance" of surviving if "she had timely treatment"; that she "had no

chance of survival without medical treatment"; and that "early treatment in cases of this type provides a 90-95% survival rate." *Id*. On appeal, the defendants dismissed this opinion as "speculation," but we stated that it "was probative evidence because it was based upon reasonable medical certainty." *Id*. And in *Brown v. State*, 770 N.E.2d 275 (Ind. 2002), the State elicited testimony from a doctor that the victim's "chances for survival were good had she received prompt medical treatment" after her father fractured her skull with a wooden paddle. *Id*. at 281. The court affirmed the victim's mother's neglect conviction, holding that "overwhelming evidence" proved that the victim "would still be alive had she received [medical treatment] promptly." *Id*.

[36] Patel observes that the State failed to elicit similar testimony from its medical experts in this case. The State chastises Patel for "deliberately induc[ing] the premature delivery of her baby" with no "medical supervision and in a setting where there would be no [neonatal intensive care unit] or medical help available for the child." Appellee's Br. at 28, 29. But these considerations are invalid under *Herron*, in which we stated that the plain language of the neglect statute "contemplates only acts that place one who is a dependent at the time of the conduct at issue in a dangerous situation – not acts that place a future dependent in a dangerous situation." 729 N.E.2d at 1011.[13] The State also criticizes Patel for cutting the umbilical cord "without first calling 911 or

---

[13] Indeed, the jury in this case was instructed that "[t]o be guilty of Neglect of a Depend[e]nt the conduct alleged must be based on acts committed by the Defendant that occurred *after* the birth of the child." Appellant's App. at 277 (emphasis added).

otherwise seeking medical advice." Appellee's Br. at 29. However, the State charged Patel with neglect based on her failure to provide medical care, not her affirmative act of cutting the umbilical cord. "It is a denial of due process of law to convict an accused of a charge not made." *Hazlett v. State*, 229 Ind. 577, 583, 99 N.E.2d 743, 745 (1951).

[37] In an attempt to bridge the evidentiary gap, the State points to Dr. McGuire's testimony that "it was 'absolutely' possible that the baby could have survived even though not born in a hospital," as well as Dr. Byrne's testimony that a baby of twenty-four weeks gestation would "have a better chance of survival with medical intervention"[14] and Dr. Prahlow's testimony that "the baby's lungs were sufficiently developed to be capable of respiration" and that he "found no abnormalities or problems in his examination of the baby." *Id*. at 29, 30 (quoting Tr. A at 549). However, none of the witnesses testified as to how quickly any medical care could have been provided or whether it could have changed the outcome. At most, the foregoing testimony establishes only a possibility that Patel's baby would not have died but for Patel's failure to

---

[14] The State notes that Dr. Byrne testified that the survival rate for a baby of twenty-four weeks gestation was "much higher" than forty percent, Tr. A at 479, but he clarified that this statistic is for hospital births. *Id*. at 480. Dr. Byrne also testified that "[s]ometimes babies" of twenty-three to twenty-five weeks gestation "will need help with breathing and they'll need to be ventilated. Sometimes they'll need medication to start out in terms of to boost their heart rate. It all depends." *Id*. at 481. The State elicited no testimony regarding how quickly such treatment could have been provided or whether it could have made any difference in this case. By contrast, Patel's expert, forensic pathologist Dr. Shaku Teas, testified that, based on her evaluation of the baby's lung development, it "would not [have been] possible" to "even get the child to a hospital or have an ambulance arrive before it expired[.]" Tr. B at 305.

provide medical care immediately after its birth.[15]  As such, it falls short of satisfying the State's burden of proving guilt with respect to this element beyond a reasonable doubt.  *See Willis*, 27 N.E.3d at 1068 (a reasonable inference of guilt must be more than mere conjecture).

[38]  Courts in other states have confronted similar evidentiary shortfalls regarding causation and reached similar conclusions.  *See, e.g.*, *Commonwealth v. Pugh*, 969 N.E.2d 672, 688 (Mass. 2012) (reversing mother's involuntary manslaughter conviction following unassisted home breech birth:  "Speculation that the baby might have survived if the defendant had summoned medical help does not satisfy the Commonwealth's burden of proving causation beyond a reasonable doubt because that the baby *might* have survived with proper care … engender[s] considerable doubt as to what actually happened.") (citation and quotation marks omitted); *State v. Muro*, 695 N.W.2d 425, 432 (Neb. 2005) (finding evidence insufficient to support mother's conviction for child abuse resulting in death where medical experts could not say that survival was probable with immediate treatment for victim's skull fracture:  "The State proved only the *possibility* of survival with earlier treatment.  Such proof is insufficient to satisfy even the lesser civil burden of proof by a preponderance of

---

[15] In fact, the State failed to establish that Patel's baby would have had even a fifty-percent chance of survival if she had provided medical care immediately after its birth.  *Cf. Mayhue v. Sparkman*, 653 N.E.2d 1384, 1387 (Ind. 1995) ("Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears.  No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death.  Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact.").

the evidence."). In *Ex parte Lucas*, 792 So. 2d 1169 (Ala. 2000), the Supreme Court of Alabama reversed a mother's murder conviction premised on her failure to provide medical services to her child:

> The crucial issue is not whether Lucas had a duty to provide her injured child with medical treatment or whether she breached that duty. The evidence is sufficient to establish that Lucas, as the child's mother, at some point owed a duty to seek medical treatment for her child. The evidence is arguably sufficient to establish that, at some point, Lucas breached her duty by failing to seek medical treatment sooner than she finally sought it. The compelling issue on the merits before this Court, however, is whether the evidence establishes that Lucas's breach of duty caused her son's death. Does the evidence establish that *but for* Lucas's failure to seek prompt medical treatment for her son, her son's life would have been saved or extended? Neither the emergency room pediatrician … nor the forensic pathologist … testified that the child would have lived or lived longer if he had received medical treatment promptly after he was battered. They were the State's only medical experts.

*Id*. at 1171 (citation omitted).

[39] We are faced with a comparable lack of evidence here. Based on the foregoing, we conclude that the State failed to prove beyond a reasonable doubt that Patel's failure to provide medical care resulted in her baby's death. Therefore, we vacate Patel's conviction for class A felony neglect of a dependent and remand to the trial court with instructions to enter judgment of conviction for class D felony neglect of a dependent and resentence her accordingly.

# Section 2 – Indiana's feticide statute does not apply to Patel's conduct.

[40]    In July 2013, the feticide statute read as follows:

> A person who knowingly or intentionally terminates a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus commits feticide, a Class B felony. This section does not apply to an abortion performed in compliance with:
>
> > (1) IC 16-34; or
> > (2) IC 35-1-58.5 (before its repeal).

Ind. Code § 35-42-1-6.  A class B felony carries a sentencing range of six to twenty years, with an advisory sentence of ten years.  Ind. Code § 35-50-2-5.

[41]    The charging information alleged in pertinent part,

> Between the 9th day of July 2013, and July 13, 2013, … [Patel] did knowingly terminate a human pregnancy, to-wit:  her own pregnancy, by ingesting the medication mifepristone and/or misoprostol, or equivalent medication under generic or alternate brand name, with the intention other than to produce a live birth or to remove a dead fetus, and the conduct of [Patel] was not an abortion performed in compliance with I.C. 16-34.

Appellant's App at 219-20.

[42]    As a preliminary matter, we address Patel's contention that the feticide statute is inapplicable to her because it requires the death of a fetus.  The plain wording of the statute indicates otherwise.  *See Herron*, 729 N.E.2d at 1010 ("[I]t is just as

important to recognize what a statute does not say as it is to recognize what it does say. A court may not read into a statute that which is not the expressed intent of the legislature."). Patel's argument relies primarily on the dictionary definition of feticide, i.e., "the act of causing the death of a fetus." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/feticide (last visited June 30, 2016). But the statute merely defines the crime and labels it feticide, in apparent disregard of that definition. The State correctly observes that "Indiana does not define the crime of feticide as 'the killing of a fetus'" and that "[a] live birth undeniably constitutes a termination of a pregnancy." Appellee's Br. at 49, 50. "[W]hen a government entity's intent reveals that a word is used in a manner different from its common dictionary definition, the common dictionary definition must be disregarded." *Bd. of Dirs. of Bass Lake Conservancy Dist. v. Brewer*, 839 N.E.2d 699, 702 (Ind. 2005) (citation and quotation marks omitted). Another panel of this Court has recognized that "the language of the [feticide] statute could lead to many possibly absurd outcomes." *Shuai v. State*, 966 N.E.2d 619, 629 n.15 (Ind. Ct. App. 2012), *trans. denied*. In this case, the apparently absurd outcome is a woman being convicted under both the neglect of a dependent statute, which requires a live infant, and the feticide statute, which does not require a dead infant.

## Section 2.1 – Standard of review

[43] Patel raises several additional challenges to the applicability of the feticide statute, most of which involve statutory interpretation. "The interpretation of a

statute is a legal question, which we review de novo." *Ashley v. State*, 757 N.E.2d 1037, 1039 (Ind. Ct. App. 2001). "The first and often last step in interpreting a statute is to examine the language of the statute. We will not, however, interpret a statute that is clear and unambiguous on its face." *Id.* at 1040 (citation omitted). "Our role on appeal is to interpret and apply the statute, and absent some ambiguity, we may not substitute language that is not there." *Id.*

[44] "[D]etermining legislative intent is foremost in construing any statute and, wherever possible, this court will give deference to that intent." *Alvers v. State*, 489 N.E.2d 83, 88 (Ind. Ct. App. 1986), *trans. denied*. "The best evidence of legislative intent is surely the language of the statute itself, and courts strive to give the words in a statute their plain and ordinary meaning." *Prewitt v. State*, 878 N.E.2d 184, 186 (Ind. 2007). "Indispens[a]ble to ascertaining the legislature's intent is a consideration of the goals sought to be achieved and the reasons and policy underlying a statute. Consequently, it is necessary to view a statute within the context of the entire act, rather than in isolation, when construing the statute." *Alvers*, 489 N.E.2d at 88 (citation omitted).

[45] Penal statutes, such as those at issue here, must be strictly construed against the State. *Id.* at 89. "Criminal statutes cannot be enlarged by construction, implication, or intendment beyond the fair meaning of the language used." *Herron*, 729 N.E.2d at 1010. "Even though an act may fall within the spirit of a statute, it will not constitute a crime unless it is also within the words of the

statute." *Id.* "However, [criminal] statutes must not be construed so narrowly as to exclude cases fairly covered thereby." *Alvers*, 489 N.E.2d at 89.

## Section 2.2 – The legislature did not intend for the feticide statute to apply to illegal abortions.

[46] As mentioned above, the feticide statute provides in pertinent part that it "does not apply to an abortion performed in compliance with … IC 16-34[.]" Ind. Code § 35-42-1-6. Title 35 of the Indiana Code, in which the feticide statute appears, is entitled Criminal Law and Procedure. Title 16 is entitled Health, and Article 16-34 is entitled Abortion. Indiana Code Section 16-18-2-1 defines abortion for purposes of Title 16 as "the termination of human pregnancy with an intention other than to produce a live birth or to remove a dead fetus. The term includes abortions by surgical procedures and by abortion inducing drugs."[16] Indiana Code Section 16-34-2-1(a) provides that "[a]bortion shall in all instances be a criminal act, except when performed under" certain specified

---

[16] Indiana Code Section 16-18-2-1.6 defines "abortion inducing drug" in pertinent part as "a medicine, drug, or substance prescribed or dispensed with the intent of terminating a clinically diagnosable pregnancy with the knowledge that the termination will, with reasonable likelihood, cause the death of the fetus."

circumstances. Patel effectively concedes that the termination of her pregnancy was an abortion that was not performed under those circumstances.[17]

[47] Nevertheless, she asserts that the feticide statute "is simply not the law that governs unlawful abortions; rather, unlawful abortions are governed by the Unlawful Abortion Statute, Ind. Code § 16-34-2-7, which defines various offenses and sentences for abortions proscribed by law." Appellant's Br. at 30. She claims that this matter was resolved by the Indiana Supreme Court in *Baird v. State*, 604 N.E.2d 1170 (Ind. 1992), *cert. denied* (1993), in which the defendant strangled his wife, who was six months pregnant. The fetus apparently died in utero. Baird was convicted of murder and feticide. On appeal, he argued that the feticide statute "was enacted to punish those who perform illegal abortions and cannot reasonably be applied to a crime in which the sole act was the killing of a pregnant woman and in which there was no evidence that the defendant intended to harm the fetus." *Baird*, 604 N.E.2d at 1189. Our supreme court disagreed:

---

[17] Because we resolve this issue on other grounds, we need not address Patel's argument that applying the feticide statute to women who choose abortions would violate the Indiana and U.S. Constitutions, an argument that she raises for the first time in this appeal. We do note, however, that the Indiana Supreme Court recently expressed its "view that judicial intervention to address constitutional claims for the first time at the appellate level is not appropriate, especially … where for the most part Appellants' claims are dependent on potentially disputed facts." *Layman v. State*, 42 N.E.3d 972, 976 (Ind. 2015). Also, in *Clinic for Women, Inc. v. Brizzi*, 837 N.E.2d 973 (Ind. 2005), the court left open the question of whether Article 1, Section 1 of the Indiana Constitution confers the right to an abortion. And in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the U.S. Supreme Court confirmed "the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health." 505 U.S. 833, 846 (1992).

The feticide statute is contained in chapter 1 of article 42, Homicide, and its language exempts legal abortions. The chapter which contains the provisions regulating abortion is I.C. 35-1-58.5. Section 4 of that chapter makes it a Class C felony to knowingly or intentionally perform an abortion not expressly provided for in that chapter (or a Class A misdemeanor for a physician who performs an abortion intentionally or knowingly in violation of section 2(1)(C) or section 2.5 of that chapter). A proper construction of the feticide statute, therefore, requires that it be viewed not as an illegal abortion statute, but as an extension of the laws of homicide to cover the situation in which the victim is not a "human being" as defined by I.C. 35-41-1-14 (an individual who has been born and is alive), but a fetus.

*Id*.

[48] Today, the feticide statute is still contained in Chapter 1 of Article 42, Homicide, and its language still exempts legal abortions. But in 1993, after our supreme court decided *Baird*, our legislature recodified the provisions regulating abortion under Chapter 16-34-2, entitled Requirements for Performance of Abortion; Criminal Penalties. We find this to be a strong indication of legislative intent to draw an even clearer distinction between feticide and illegal abortions.

[49] The successor to Indiana Code Section 35-1-58.5-4, Indiana Code Section 16-34-2-7, read as follows in July 2013:

(a) Except as provided in subsections (b) and (c), a person who knowingly or intentionally performs an abortion not expressly provided for in this chapter commits a Class C felony [punishable by two to eight years of imprisonment under Indiana Code Section 35-50-2-6].

(b) A physician who performs an abortion intentionally or knowingly in violation of section 1(a)(1)(C) or 4 of this chapter [requiring written consent of the woman's parent or guardian] commits a Class A misdemeanor [punishable by up to one year of imprisonment under Indiana Code Section 35-50-3-2].

(c) A person who knowingly or intentionally performs an abortion in violation of section 1.1 of this chapter [requiring informed consent and fetal ultrasound] commits a Class A infraction [subject to a maximum judgment of $10,000 under Indiana Code Section 34-28-5-4].

(d) A woman upon whom a partial birth abortion is performed may not be prosecuted for violating or conspiring to violate section 1(b) of this chapter.[18]

Patel observes that if the feticide statute were to apply to unlawful abortions, "*each and every* one of these would automatically constitute Feticide, a Class B felony, punishable by 6-20 years imprisonment." Appellant's Br. at 31 (bold emphasis omitted). She argues, "Thus, a prosecutor would have absolute discretion to bring a Feticide charge and secure a sentence of up to 20 years, as compared to an infraction, misdemeanor, or lesser-class felony as set forth in the Unlawful Abortion Statute." *Id*.

[50] We cannot conclude that this would be permissible under *Baird*. We acknowledge that, unlike Patel's baby, the victim's fetus in *Baird* was not

---

[18] Indiana Code Section 16-34-2-1(b) provides, "A person may not knowingly or intentionally perform a partial birth abortion unless a physician reasonably believes that: (1) performing the partial birth abortion is necessary to save the mother's life; and (2) no other medical procedure is sufficient to save the mother's life."

delivered alive or as the result of an abortion. But we read our supreme court's opinion in *Baird* as standing for the unremarkable proposition that illegal abortions are governed by "the provisions regulating abortion" (now in Title 16), and not the feticide statute (still in Title 35). Since the legislature enacted the feticide statute in 1979, it has been used to prosecute third parties who knowingly terminate pregnancies by using violence against the expectant mother without her consent.[19] *See, e.g.*, *Shane v. State*, 716 N.E.2d 391 (Ind. 1999) (shooting); *Hicks v. State*, 690 N.E.2d 215 (Ind. 1997) (shooting); *Baird*, 604 N.E.2d 1170 (strangulation); *Perigo v. State*, 541 N.E.2d 936 (Ind. 1989) (beating with baseball bat); *Abbott v. State*, 535 N.E.2d 1169 (Ind. 1989) (shooting).[20] This is the first case that we are aware of in which the State has used the feticide statute to prosecute a pregnant woman (or anyone else) for

---

[19] Other courts "have recognized that the consent of the mother is the crucial element that distinguishes feticide from abortion." Douglas Curran, Note, *Abandonment and Reconciliation: Addressing Political and Common Law Objections to Fetal Homicide Laws*, 58 Duke L.J. 1107, 1134 (2009). *See, e.g.*, *State v. Holcomb*, 956 S.W.2d 286, 291-92 (Mo. Ct. App. 1997) (concluding that abortion statutes "assume the actual or apparent consent of the mother" and that fetal homicide statutes govern "unconsented (by the mother) killing of a pre-born infant, in the context of a physical assault on the mother"), *trans. denied*; *People v. Shum*, 512 N.E.2d 1183, 1199-1200 (Ill. 1987) (concluding that feticide statute does not govern abortion but "seeks to protect a pregnant mother and her unborn child from the intentional wrongdoing of a third party"), *cert. denied* (1988).

[20] In 2009, the legislature enacted a statute authorizing a sentencing enhancement of six to twenty years if the State "can show beyond a reasonable doubt that the person, while committing or attempting to commit murder under IC 35-42-1-1(1) or IC 35-42-1-1(2), caused the termination of a human pregnancy." Ind. Code § 35-50-2-16(a). "[E]nhancement of the penalty for that crime does not require proof that: (1) the person committing or attempting to commit the murder had knowledge or should have had knowledge that the victim was pregnant; or (2) the defendant intended to cause the termination of a human pregnancy." Ind. Code § 35-50-2-16(d). This statute is further evidence of the legislature's intent that feticide be viewed as a crime committed *against* a pregnant woman and not as a crime committed *by* a pregnant woman.

performing an illegal abortion, as that term is commonly understood.[21]  We find this to be an abrupt departure from the foregoing cases as well as the much more recent *Kendrick v. State*, in which the State used the feticide statute to prosecute a bank robber who shot a pregnant teller in the abdomen.  947 N.E.2d 509 (Ind. Ct. App. 2011), *trans. denied*, *cert. denied* (2012).  In its appellate brief in *Kendrick*, the State "ma[de] clear that the victim of feticide is the mother (the one whose pregnancy has been terminated)."  *Id*. at 514 n.7.  The State's about-face in this proceeding is unsettling, as well as untenable under *Baird*.

[51]  Furthermore, we cannot conclude that the legislature intended for the specific provisions and lesser penalties in Indiana Code Section 16-34-2-7 to be subsumed by the general and more punitive feticide statute.  *See Riley v. State*, 711 N.E.2d 489, 495 (Ind. 1999) ("[W]e do not presume that the legislature intended language used in a statute to be applied illogically or to bring about an unjust or absurd result[.]"); *Alvers*, 489 N.E.2d at 88 (noting that courts may

---

[21] In *Shuai*, 966 N.E.2d 619, the defendant was charged with murder and attempted feticide after she ingested rat poison in an attempt to kill herself and her late-term fetus, which was delivered alive via caesarean section and later died as a result of the poison.  On appeal from the denial of her motion to dismiss the charges, Shuai argued that the feticide statute was ambiguous as applied to her and that it did not apply to pregnant women in relation to their own fetuses.  The majority explicitly rejected Shuai's first argument and implicitly rejected the second.  *See id*. at 629 ("Nor can we find the feticide statute ambiguous as applied here, as it is undisputed Shuai's pregnancy was terminated when A.S. was born, and the State seems prepared to argue it was Shuai's intent to end her pregnancy when she ingested rat poison.").  The State notes that the legislature has not amended the feticide statute since *Shuai* was decided and argues that this alleged acquiescence shows that the majority "correctly applied the feticide statute in accord with the legislative intent[,]" i.e., that it may apply "to a woman with regard to her own pregnancy[.]"  Appellee's Br. at 35.  At its core, *Shuai* was a case of attempted suicide with the termination of a pregnancy as a collateral consequence.  Because the majority did not specifically address whether the feticide statute applies to illegal abortions, we do not find *Shuai* persuasive or controlling here.

"look beyond the statute's language to the titles and headings of the statute" to determine legislative intent). We find it significant that although the definition of abortion in Title 16 and the definition of feticide in Title 35 are nearly identical, only the former mentions surgical procedures and abortion-inducing drugs. Also, we find it significant that the feticide statute does not say that it applies to an abortion performed in violation of Chapter 16-34. *See Herron*, 729 N.E.2d at 1010 ("[I]t is just as important to recognize what a statute does not say as it is to recognize what it does say. A court may not read into a statute that which is not the expressed intent of the legislature.").

[52] The State directs us to Indiana Code Section 16-34-2-3, which provides in relevant part as follows:

> (a) All abortions performed on and after the earlier of the time a fetus is viable or the time the postfertilization age of the fetus is at least twenty (20) weeks shall be:
>
> > (1) governed by section 1(a)(3) and 1(b) of this chapter;
> >
> > (2) performed in a hospital having premature birth intensive care units, unless compliance with this requirement would result in an increased risk to the life or health of the mother; and
> >
> > (3) performed in the presence of a second physician as provided in subsection (b).
>
> (b) An abortion may be performed after the earlier of the time a fetus is viable or the time the postfertilization age of the fetus is at least twenty (20) weeks only if there is in attendance a physician,

other than the physician performing the abortion, who shall take control of and provide immediate care for a child born alive as a result of the abortion. During the performance of the abortion, the physician performing the abortion, and after the abortion, the physician required by this subsection to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child. However, this subsection does not apply if compliance would result in an increased risk to the life or health of the mother.

(c) Any fetus born alive shall be treated as a person under the law, and a birth certificate shall be issued certifying the child's birth even though the child may subsequently die, in which event a death certificate shall be issued. Failure to take all reasonable steps, in keeping with good medical practice, to preserve the life and health of the live born person shall subject the responsible persons to Indiana laws governing homicide, manslaughter, and civil liability for wrongful death and medical malpractice.

[53]     The State contends that this statute

demonstrates that the legislature never intended all abortion attempts to be subject only to the unlawful abortion statute in Title 16. At the very least, under the circumstances of this case it is clear that the legislature did not intend the unlawful abortion statute to be the sole avenue of prosecution. The evidence shows that [Patel's] baby was on or past the age of viability, [Patel] did not induce the termination of her pregnancy in a hospital with a premature birth intensive care unit or in the presence of a second physician who would be available to care for the baby, the baby was born alive, and [Patel] was the sole person responsible for failing to take any, much less all, reasonable steps to attempt to preserve his life and health. As such, she was subject to the Indiana laws governing homicide, which include the feticide statute.

Appellee's Br. at 45.

[54] Indiana Code Section 16-34-2-3(c) is the provision in Chapter 16-34-2 that most closely addresses the circumstances of Patel's abortion, i.e., the abortion of a viable fetus that results in a live birth. But the phrases "physician performing the abortion," "good medical practice," "medical malpractice," and "responsible persons," as well as the wording of the statute as a whole, indicate that the legislature intended for any criminal liability to be imposed on medical personnel, not on women who perform their own abortions, which brings us to Patel's next argument.

## Section 2.3 – The legislature did not intend for the feticide statute to apply to women who have abortions.

[55] Patel traces the history of abortion legislation in Indiana, noting that "the first abortion statute in 1835 did not punish women who had abortions[.]" Appellant's Br. at 36.[22] In 1881, the legislature enacted a misdemeanor statute[23]

---

[22] *See* 1835 Ind. Acts ch. XLVII, § 3 ("That every person who shall wilfully administer to any pregnant woman, any medicine, drug, substance or thing whatever, or shall use or employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall upon the conviction, be punished by imprisonment in the county jail any term of time not exceeding twelve months, and be fined any sum not exceeding five hundred dollars.").

[23] *See* 1894 Ind. Acts ch. 651, § 1997 ("Every woman who shall solicit of any person any medicine, drug, or substance or thing whatever, and shall take the same, or shall submit to any operation or other means whatever, with intent thereby to procure a miscarriage, except when by a physician for the purpose of saving the life of mother or child, shall be fined not more than $500 nor less than ten dollars, and imprisoned in the county jail not more than twelve months or less than 30 days, and any person who in any manner whatever unlawfully aids or assists any such woman to be a violation of this section, shall be liable to the same penalty.").

that punished women who had abortions, but it "was only applied to third parties who performed or procured the miscarriage." *Shuai*, 966 N.E.2d at 635 (Riley, J., dissenting). Patel also notes that in 1977, four years after the U.S. Supreme Court legalized abortion in *Roe v. Wade*, 410 U.S. 113 (1973), the legislature repealed the misdemeanor statute and also removed language from a 1973 statute that made it a crime for persons to knowingly aid or abet the performance of an abortion. 1977 Ind. Acts ch. 335, §§ 21, 1.

[56] In a footnote in her brief, Patel asserts that "English common law afforded pregnant women immunity from prosecution for their own abortions" and notes that the *Shuai* majority rejected a similar assertion regarding the actions of a pregnant woman against her own fetus. Appellant's Br. at 40 n.11 (citing *Shuai*, 966 N.E.2d at 631). Patel observes that we may decide the issue differently, should we reach it, and claims that "[s]pace limitations preclude offering arguments on that issue beyond the adoption by reference of Judge Riley's analysis" in her *Shuai* dissent. *Id.* This tangential reference to common law immunity is insufficient to preserve the issue on appeal, especially since it was not raised before the trial court. *See Hape v.* State, 903 N.E.2d 977, 997 (Ind. Ct. App. 2009) (stating that a party may not raise an argument for the first time on appeal), *trans. denied*; *see also Bigler v. State*, 732 N.E.2d 191, 197 (Ind. Ct. App. 2000) ("[A] party may not present an argument entirely by incorporating by reference from a source outside the appellate briefs."), *trans. denied*. In any event, if common law immunity ever did exist in Indiana, it was eliminated by the passage of the 1881 misdemeanor statute.

[57] That being said, we are persuaded by Patel's argument that the legislature's repeal of the 1881 statute and its amendment of the 1973 statute "evince an unmistakable legislative decision not to prosecute a woman under the abortion laws based on her own abortion." Appellant's Br. at 37. Moreover, as mentioned above, the legislature has exempted pregnant women from prosecution for having partial birth abortions, which are prohibited in most circumstances. Ind. Code § 16-34-2-7. And just this year, the legislature enacted a provision exempting pregnant women from prosecution for abortions performed solely because of the fetus's sex, race, color, national origin, or ancestry, as well as for abortions performed solely because of certain fetal disorders or disabilities, all of which have been prohibited. *See* Ind. Code § 16-34-4-9(b) ("A pregnant woman upon whom an abortion is performed in violation of this chapter may not be prosecuted for violating or conspiring to violate this chapter.") (effective July 1, 2016).

[58] The State argues that these exemptions demonstrate "that the legislature knows how to create an exception when it intends one. Tellingly, however, the legislature has never included an exception in the feticide statute to prevent it from being applied to the pregnant woman herself." Appellee's Br. at 35. We think that it is illogical to presume that our legislators specifically exempted pregnant women from prosecution for those types of abortion they found to be most odious while allowing prosecution of pregnant women for other types of abortions pursuant to the feticide statute. And given that the legislature decriminalized abortion with respect to pregnant women only two years before

it enacted the feticide statute, we conclude that the legislature never intended the feticide statute to apply to pregnant women in the first place and therefore never saw the need to create an exception. Accordingly, we vacate Patel's feticide conviction.

## Conclusion

[59] We vacate Patel's convictions for class A felony neglect of a dependent and feticide. We remand to the trial court with instructions to enter judgment of conviction for class D felony neglect of a dependent and resentence Patel accordingly.

[60] Vacated and remanded.

Vaidik, C.J., and Bailey, J., concur.