## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 24 2020, 7:06 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Noe Dudas
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert L. Yates
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Catherine Adkins, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | April 24, 2020 <br><br> Court of Appeals Case No. 19A-CR-2121 <br><br> Appeal from the Wayne Circuit Court <br><br> The Honorable David A. Kolger, Judge <br><br> Trial Court Cause No. 89C01-1602-F1-1 |

**Altice, Judge.**

# Case Summary

[1] Following a bench trial, Catherine J. Adkins was convicted of neglect of a dependent resulting in death, a Level 1 felony. On appeal, Adkins argues that the evidence is insufficient to support her conviction.

[2] We affirm.

# Facts & Procedural History

[3] On October 24, 2015, Adkins, Meggan Himelick, and nine-year-old K.B., of whom Himelick had guardianship, attended the Halloween Howl event in Richmond. While there, they met up with Himelick's longtime friend, Holly Collette, who brought her eleven-month-old son K.S. and two other children. K.S. had been acting normal all day and evening and had no visible bruising or abrasions to his face.

[4] Around 6:30 p.m., Adkins, Himelick, and K.B. left the event and took K.S. with them. Adkins and Himelick often watched K.S., and it was not unusual for K.S. to stay overnight. After stopping for food, they made it back to their apartment around 7:00 p.m. K.B. was in the family room watching television, and Adkins and Himelick took K.S. back to their bedroom where K.S. took a bottle and then fell asleep on their bed. In the meantime, Adkins and Himelick smoked marijuana and watched a movie in the bedroom. After the movie ended around 9:00 p.m., Himelick headed to the kitchen to do dishes, leaving Adkins in the room with K.S., who was starting to wake.

[5] According to Himelick, Adkins came out of the bedroom carrying K.S. between 9:15 and 9:30 p.m. Adkins told Himelick that she tripped over a pillow in the bedroom and fell against the doorframe, but she did not think K.S. hit his head. Using a flashlight, Himelick checked K.S.'s pupils and noted that he appeared to be fine. Himelick said that K.S. then sat on the floor and drank more formula from his bottle. At 9:54 p.m., Himelick sent the following text message to Collette: "[K.S.] don't feel good. He won't let us put him down. He's crying real bad. Well [Adkins] has him calmed down now. Has he been like that all day today?" *State's Exhibit* 1. Soon after, K.S. started shaking and his breathing became shallow. Their apartment was across the street from Reid Hospital, so they then took K.S. to the emergency room.

[6] At 10:00 p.m., Adkins carried a "limp" K.S. into the emergency room. *Transcript Vol. II* at 68. Tobey Gilmore, a triage nurse, asked what had happened. Adkins stated that she did not know but explained that K.S. had been fussy and did not take his bottle well. Noting that K.S.'s color was not good and that he was not breathing properly, Gilmore immediately took him to the trauma resuscitation room and called for a rapid response team. Thereafter, Gilmore went back to the waiting room where he overheard Adkins and Himelick discussing how Adkins fell into a doorframe while holding K.S.

[7] Dr. Michael Baldwin treated K.S. in the emergency room. Given his initial observations that K.S. had a bruise on his left forehead, was unresponsive, was not breathing, and had low blood pressure, Dr. Baldwin ordered a CT scan, which confirmed that K.S. had a very serious brain injury. Dr. Baldwin opined

that K.S.'s head injury could not have occurred by Adkins falling with K.S. in her arms and K.S. hitting his head on the doorframe, but rather, K.S.'s head injury was consistent with inflicted trauma.

[8] K.S. was transferred to Riley Children's Hospital in Indianapolis, where he underwent emergency surgery to relieve pressure on his brain. When Collette and K.S.'s father arrived at Riley, they were informed that despite the medical intervention, K.S. was brain dead. The decision was made to remove K.S. from life support, and he died on October 25, 2015.

[9] Dr. Mirfrida Geller, a forensic pathologist with the Marion County Coroner's Officer, performed an autopsy on K.S. As part of her external examination, Dr. Geller noted several injuries consistent with inflicted, blunt-force trauma, including a forehead contusion, an abrasion surrounded by a contusion on the right cheek near the right ear, an abrasion surrounded by a contusion on the left cheek near the left ear, a small abrasion near the right brow, a large bruise around the right eye, and an abrasion and contusion on the top, right side of the head. During her internal examination, Dr. Geller discovered a "severe" subdural hematoma inside K.S.'s skull caused by several hemorrhages from the meninges covering his brain tissue. *Id*. at 221. The hematoma covered all of the right side and some of the left side of K.S.'s brain. The severity of the hematoma was such that the pressure it created shifted the right hemisphere of K.S.'s brain approximately seven millimeters to the left. This brain shift caused extensive damage to the fluid-housing structures of K.S.'s brain, which

produced the respiratory failure and very low blood pressure K.S. presented with at the emergency room.

[10] In addition to the hemorrhages of the meninges, Dr. Geller noted that K.S. suffered a severe hemorrhage at the base of his skull, small contusions on the brain cortex, and multilayer hemorrhages in the cortex on the right side of his brain. K.S. also had retinal hemorrhaging in both eyes. Dr. Geller opined that her findings were consistent with multiple acts of blunt force trauma and specifically found them inconsistent with a stumble into a door as described by Adkins. Dr. Geller concluded that K.S.'s cause of death was homicide as the multiple injuries he suffered were inflicted by someone else.

[11] On February 19, 2016, the State charged Adkins with neglect of a dependent resulting in death, a Level 1 felony. A bench trial was held July 24-25, 2019. At trial, Dr. Ralph Hicks, a physician who is board certified in child abuse pediatrics and a professor of clinical pediatrics at Indiana University School of Medicine, testified that he performed an external examination of K.S. and reviewed all available medical records. Dr. Hicks explained that severe retinal hemorrhaging, like that seen in K.S., is consistent with inflicted trauma and inconsistent with accidental head injuries or short falls. He described the numerous bruises found on K.S.'s cheeks, around his eye, and about his head. Because the five different locations of soft-tissue injuries on K.S.'s head were on different planes of the body, Dr. Hicks concluded that K.S. suffered from multiple blunt-force impacts. Dr. Hicks opined that Adkins's explanation of what happened did not "adequately explain . . . the number . . . of different

injuries" K.S. sustained. *Transcript Vol. III* at 12. Given Adkins's explanation of how she tripped while holding K.S., Dr. Hicks believed it would have been "awfully unusual" for K.S. to have sustained a fatal injury. *Id.*

[12] Dr. Hicks further testified that when a child unable to talk presents with significant injuries and the explanation offered by the child's caregiver is not consistent therewith or changes over time, such is evidence to a practitioner that someone may have inflicted the child's injuries. Dr. Hicks concluded that such was the case here. Specifically, when Adkins arrived at Reid Hospital, she said only that K.S. had been fussy and did not eat well and that she did not know what had happened. She was later overhead explaining that she tripped and fell into a door frame while carrying K.S. When Collette arrived at Reid Hospital, she confronted Adkins and asked her what happened, and Adkins responded that nothing happened. A short time later, Adkins voluntarily told the discharge planner at Reid Hospital that she had tripped while holding K.S. and hurt herself but that K.S. was not hurt. Later that night, when questioned by police, Adkins stated that she had tripped over a pillow and fell into the door frame but that she did not believe K.S. hit his head. When questioned by a family case manager with the Department of Child Services, Adkins stated that when she tripped, K.S.'s head "jerked forward very hard." *Transcript Vol. II* at 118.

[13] Regardless of what caused K.S.'s injuries, Dr. Hicks testified that he would not have expected K.S. to act normally, i.e., sitting up, making eye contact, eating, or smiling, after sustaining such injuries. Dr. Hicks testified that immediately

after suffering the type of forceful blows that K.S. did, a reasonable person would have known that K.S. was in immediate danger. Finally, Dr. Hicks explained that in the case with active bleeding and brain swelling, prompt medical care increases the likelihood of a more favorable outcome.

[14] On July 29, 2019, the trial court found Adkins guilty as charged. Following a sentencing hearing on August 15, 2019, the trial court sentenced Adkins to thirty years with ten years suspended. Adkins now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[15] Our standard of review for sufficiency claims is well settled. *Dickenson v. State*, 835 N.E.2d 542, 551 (Ind. Ct. App. 2005), *trans. denied*. We do not reweigh the evidence or assess the credibility of witnesses. *Id*. We look to the evidence and the reasonable inferences to be drawn therefrom that support the verdict. *Id*. We will affirm the convictions if there is sufficient probative evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id*. at 552.

[16] Ind. Code § 35-46-1-4(a) provides, in pertinent part, that "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally ... places the dependent in a situation that endangers the dependent's life or health ... commits neglect of a dependent, a Level 6 felony." The offense is elevated to a Level 1 felony "if it is committed ... by a person at least eighteen (18) years of age and results in the

death of a dependent who is less than fourteen (14) years of age." I.C. § 35-46-1-4(b)(3). "A person engages in conduct 'intentionally' if, when [s]he engages in the conduct, it is [her] conscious objective to do so." Ind. Code § 35-41-2-2(a). "A person engages in conduct 'knowingly' if, when [s]he engages in the conduct, [s]he is aware of a high probability that [s]he is doing so." I.C. § 35-41-2-2(b). For the purposes of the neglect statute, a knowing behavior means that "the accused must have been subjectively aware of a high probability that [s]he placed the dependent in a dangerous situation." *Armour v. State*, 479 N.E.2d 1294, 1297 (Ind. 1985).

[17] Adkins does not challenge the sufficiency of the evidence as to the age-related elements or that K.S. was a dependent in her care. She argues that the evidence is insufficient to prove (1) that she knowingly or intentionally placed K.S. in a situation that endangered his life or health and (2) that her conduct resulted in his death. Specifically, Adkins argues that smoking marijuana in the same room where K.S. was sleeping and later tripping over pillows on the floor while carrying K.S., which caused K.S.'s head and neck to "whip hard," does not establish that she knowingly or intentionally placed K.S. in a situation that endangered his life or health. *Appellant's Brief* at 14. Adkins's argument overlooks evidence favorable to the conviction.

[18] Dr. Geller described five different areas of soft tissue damage about K.S.'s head that resulted from blunt force trauma. These abrasions and contusions were not present earlier in the evening but were inflicted during a short window of time when K.S. was in Adkins's care. Both Dr. Geller and Dr. Hicks testified that

Adkins's explanation of how she tripped and fell against the door while carrying K.S. did not account for the numerous injuries about K.S.'s head. Dr. Geller also determined that the blunt force trauma inflicted on K.S. resulted in a severe subdural hematoma that caused the right side of K.S.'s brain to shift seven millimeters to the left in addition to bleeding at the base of his brain. K.S. also suffered retinal hemorrhages that Dr. Hicks described as consistent with inflicted trauma. Dr. Hicks testified that the force necessary to inflict such injuries would have been such that a reasonable person would have known that K.S. was in immediate danger. The evidence was that K.S. suffered the trauma to his head while in the bedroom under Adkins's exclusive care and that Adkins came out of the bedroom between 9:15 p.m. and 9:30 p.m. K.S. was not taken to the hospital until 10:00 p.m., by which time he had become unresponsive and had shallow, labored breathing.

[19]   In addition to the medical findings, Dr. Hicks noted that when the explanation given by the caregiver does not adequately explain the injuries or when the explanation changes, such indicates to a practitioner that the injuries may have been inflicted. Here, aside from the fact that her explanation did not adequately account for K.S.'s injuries, Adkins's explanation of what happened to K.S. was not consistent. Her story changed from nothing happened, to she tripped and fell and K.S. was not injured, to she tripped and fell and K.S.'s head whipped forward but did not hit the doorframe as she fell against it. Regardless of what transpired while K.S. was in Adkins's care, it was significant enough that when Adkins came out of the bedroom and spoke with Himelick, Himelick used a

flashlight to see if K.S.'s pupils reacted. Further, Dr. Hicks explained that after sustaining the serious injuries that K.S. did, he would not have expected K.S. to act normally as Himelick described his behaviors shortly after he suffered the trauma to his head. Further belying the claims that K.S. was acting normally is Himelick's text message to Collette. Mere minutes after sending the text message, Adkins carried K.S.'s limp body into the emergency room.

[20] Although Adkins claims that she only tripped and fell while holding K.S., her story does not adequately explain the number and severity of the injuries K.S. sustained while in her care. In light of Dr. Geller's medical findings and Dr. Hick's expert testimony, the trier of fact—here, the trial court—could have reasonably concluded that Adkins should have been aware that her actions, whatever they were, placed K.S. in a dangerous situation and that medical care was warranted. This satisfies the knowing element of the neglect of a dependent statute.

[21] Adkins also argues that the evidence is insufficient to prove that her actions resulted in K.S.'s death. This Court has determined that "the phrase 'results in the death of a dependent' for purposes of the neglect statute . . . implicates proximate causation." *Patel v. State*, 60 N.E.3d 1041, 1052 (Ind. Ct. App. 2016). Under this standard, the State must, at a minimum, prove beyond a reasonable doubt that the death would not have occurred "but for" the neglectful act. *Id*.

As noted above, K.S. suffered multiple severe injuries to his head that were not adequately explained by the trip and fall scenario provided by Adkins and that the force used to inflict such injuries was such that a reasonable person would have known that the child was in immediate danger. Yet, from the evidence, it took up to an hour before Adkins sought medical assistance for K.S. As Dr. Hicks testified, in the case of bleeding on the brain, prompt medical care increases the chances of a more positive outcome. Here, whether prompt medical care would have changed the outcome in this case is unknown. The delay in seeking medical care, however, clearly contributed to K.S.'s untimely death. Adkins's inflicted the lethal injuries on K.S. and delayed treatment for him. The trier of fact could have reasonably concluded that her conduct resulted in K.S.'s death.

In light of the forgoing, we conclude that the evidence is sufficient to support Adkins's conviction for neglect of a dependent resulting in death as a Level 1 felony.

Judgment affirmed.

Bailey, J. and Crone, J., concur.