

FILED

May 06 2026, 9:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



# IN THE
# Court of Appeals of Indiana

Nicholas A. Blackburn,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

May 6, 2026

Court of Appeals Case No.
25A-CR-2222

Appeal from the Delaware Circuit Court

The Honorable John M. Feick, Judge

Trial Court Cause No.
18C04-2308-F4-52

---

**Opinion by Judge Mathias**
Judge Felix concurs.
Judge May concurs in part and dissents in part with a separate opinion.

**Mathias, Judge.**

In April 2023, Nicholas A. Blackburn, with fentanyl and a fentanyl metabolite in his blood, crashed his vehicle into the back of Brittany Wilson's vehicle in Muncie. Wilson was twenty to twenty-four weeks pregnant at the time. The crash killed Wilson. At the emergency room, doctors observed that Wilson's unborn child had a heartbeat but was in distress; they performed an emergency C-section and immediately transported the child to neonatal specialists. However, the child died soon afterward.

The State charged Blackburn in relevant part with two counts of Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance or its metabolite in his blood, with one count based on Wilson's death and the other based on the death of her child.[1] Following the jury's verdict of guilty on both counts, Blackburn raises the following two issues for our review:

> 1. Whether the trial court abused its discretion when it admitted the analysis of his blood draw into evidence.
>
> 2. Whether the State presented sufficient evidence to show that Blackburn caused the death of another "person" based on the death of Wilson's child.

---

[1] The State charged Blackburn with two counts under Indiana Code section 9-30-5-5(a) (2022). Indiana Code section 9-30-5-5(c) states that "[a] person who commits an offense under subsection (a) . . . commits a separate offense for each person . . . .whose death . . . is caused by the violation . . . ."

[3] We conclude that the trial court did not err in the admission of the evidence. We also conclude that the State presented sufficient evidence from which a reasonable fact-finder could conclude that Wilson's child was a person. We therefore affirm his convictions.

## Facts and Procedural History

[4] Around 6:30 p.m. on April 27, 2023, Blackburn crashed his SUV into the back of Wilson's sedan near the intersection of East Jackson Street and North Truitt Street in Muncie. "[D]ebris" from the crash "went flying," causing other motorists nearby to come to sudden stops. Tr. Vol. 2, p. 118. Wilson's vehicle went "spinning" into the oncoming lanes. *Id.* at 130. Blackburn "stumbled out" of his SUV, and one witness observed that he "seemed more upset about the state of [his] car than the actual accident." *Id.* at 119.

[5] Others at the scene rushed to Wilson. One witness observed that she was "unconscious," slumped over into the passenger seat, and "not responsive." *Id.* at 130. Her car doors were "jammed up" and would not open. *Id.* James Omey, a witness who has Navy training for "mass triage" and medical knowledge, broke Wilson's passenger's side window and crawled into Wilson's car with her. *Id.* at 215. He noticed that she was nonresponsive, "had no pulse," and appeared to be pregnant. *Id.* at 216. He began CPR on her.

[6] Approximately ten minutes after Omey began CPR, emergency medical personnel arrived on the scene. August Holderman, a responding paramedic, first noticed "several firemen that seemed to be emotionally upset flagging" the

paramedics down and "yelling at us to hurry up." *Id.* at 146. "At least one of [the firemen] was crying." *Id.* Emergency responders had removed Wilson from the vehicle and placed her on a cot. Holderman observed that Wilson appeared to be deceased and also appeared "twenty weeks pregnant or more." *Id.* at 147. Wilson's husband was on the scene by that point, and he informed Holderman that Wilson "was 5 months pregnant." Ex. Vol. 1, p. 19.

[7] At that moment, Holderman believed "[t]hat that baby could possibly be saved." Tr. Vol. 2, p. 147. Holderman knew that the hospital to which they were transporting Wilson had "very good care for premature babies. And anything below twenty weeks is usually considered a non-viable baby if it is born. Anything above twenty weeks, if they are able to get that baby out, then it does have a chance of living . . . ." *Id.*

[8] Paramedics rushed Wilson to the nearby emergency room, but she "never had a pulse." *Id.* at 150. Upon Wilson's arrival to the emergency room, Dr. Brad Hayes immediately performed an ultrasound. He observed that Wilson's unborn child "showed signs of life," namely, "a heartbeat," but the heartbeat rate showed the child to be in distress. *Id.* at 192. The ultrasound also showed that the child's growth was "consistent with a child . . . that was somewhere around twenty to twenty-four weeks" of gestational age. *Id.* at 193. In Dr. Hayes's opinion, "if the fetus is twenty-four weeks, we have a good chance of survival." *Id.* However, "[u]nder twenty-four weeks, that chance is much less." *Id.*

Within minutes of Wilson's arrival, Dr. Hayes concluded that "we don't have any more time to waste" and "we're going to . . . [try] to make sure this baby makes it." *Id.* He and his team then removed the child from Wilson's womb by way of an emergency C-section. Dr. Hayes had a neonatal specialist ready to receive Wilson's child, and he "passed that baby right off." *Id.* at 194. However, shortly after, the child died. *Id.* at 194-95.

Back at the crash scene, Delaware County Sheriff's Deputy Britney Milholland informed Blackburn of Indiana's implied consent laws. She administered a portable breath test to him, which returned a negative result for alcohol intoxication. She then asked him if he would consent to a chemical test, and he "agreed to take the chemical test." *Id.* at 156. She transported him to the nearby hospital, where Blackburn again expressly "consented" to have a nurse perform a blood draw. *Id.* at 157. The ensuing analysis of his blood showed the presence of fentanyl as well as a metabolite of fentanyl in the blood. *Id.* at 208.

The State charged Blackburn in relevant part with two counts of Level 4 felony causing death when operating a vehicle with a schedule I or II controlled substance or its metabolite in his blood, with one count based on Wilson's death and the other based on the death of her child. Several witnesses to the accident testified at his ensuing jury trial. Holderman and Dr. Hayes also testified regarding their observations from that day and to their knowledge of

neonatal viability.[2] The trial court also admitted into evidence, over Blackburn's objection, the results of his blood draw following the accident.

[12] The jury found Blackburn guilty of both offenses. After a sentencing hearing, the court ordered Blackburn to serve an aggregate sentence of twenty years in the Department of Correction.[3] This appeal ensued.

## 1. The trial court properly admitted the analysis of the blood draw into evidence.

[13] We first address Blackburn's argument that the trial court erred when it admitted the analysis of his blood draw into evidence. The trial court has broad discretion to rule on the admissibility of evidence. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017). Rulings on the admissibility of evidence are reviewed for an abuse of discretion and ordinarily reversed only when admission is clearly against the logic and effect of the facts and circumstances that were before the court. *Id.*

[14] Indiana Code section 9-30-7-3(a) requires a law enforcement officer to "offer a portable breath test or chemical test to any person who the officer has reason to believe operated a vehicle that was involved in a fatal accident or an accident

---

[2] Blackburn lodged no objection to any portion of Holderman's testimony, and Blackburn specifically did not challenge Holderman's competence to testify regarding the child's viability. Had Blackburn objected on the ground that Holderman lacked sufficient qualifications to opine on the relevant medical issues, perhaps the State would have bolstered that component of the record. But, as there was no objection, the State had no need to do so.

[3] The maximum sentence for two consecutive Level 4 felonies is twenty-four years. *See* I.C. § 35-50-2-5.5. We also note that Blackburn has eighteen prior felony convictions and seventeen prior misdemeanor convictions.

involving serious bodily injury." Subsection (a)(2) of that statute adds: "If . . . the results of a portable breath test do not indicate the presence of alcohol but the law enforcement officer has probable cause to believe the person is under the influence of a controlled substance or another drug" the officer "*shall* offer a chemical test to the person." I.C. § 9-30-7-3(a)(2) (emphasis added). As we have explained, subsection (a)(2) is about "compel[ling] law enforcement officers not to conclude their investigation when they receive a negative portable breath test result and also have probable cause to believe that the driver is under the influence of something other than alcohol." *Pedigo v. State*, 146 N.E.3d 1002, 1011-12 (Ind. Ct. App. 2020), *trans. denied*. Nothing about the statute as a whole "*prohibits* a law enforcement officer from offering a subsequent chemical test" if a portable breath test is offered first and returns a negative result. *Id.* at 1011 (emphasis in original).

[15] There is no question that Deputy Milholland had reason to believe that that statute applied to Blackburn. There is no question that she informed Blackburn of that statute. And, while she first offered Blackburn a portable breath test that returned negative results for alcohol intoxication, there is also no question that Blackburn then twice consented to a chemical test by way of the blood draw.

[16] Nonetheless, relying on a panel opinion from our Court in *Hannoy v. State*, Blackburn contends that Deputy Milholland needed probable cause that he was under the influence of a controlled substance before she could offer him a chemical test. 789 N.E.2d 977 (Ind. Ct. App.), *aff'd on reh'g*, 793 N.E.2d 1109 (Ind. Ct. App. 2003), *trans. denied*. Blackburn is incorrect. Our opinion in

*Hannoy* was expressly *not* about Indiana's implied consent laws. 789 N.E.2d at 982-83. Accordingly, *Hannoy* is not applicable here.

[17] Further, Blackburn does not discuss the *Pedigo* panel's analysis of section 9-30-7-3, which makes clear that an officer can always ask a driver to submit to a chemical test. 146 N.E.3d at 1011-12. As that is what Deputy Milholland did here, and as Blackburn expressly consented to the blood draw, the trial court properly admitted the results of the blood draw into evidence.

## 2. The State presented sufficient evidence to show that Wilson's child was a person.

[18] We thus turn to Blackburn's argument that the State failed to present sufficient evidence to support his conviction resulting from the death of Wilson's child. For challenges to the sufficiency of the evidence, we consider only the probative evidence and the reasonable inferences therefrom that support the judgment of the trier of fact. *Hall v. State*, 177 N.E.3d 1183, 1191 (Ind. 2021). We will neither reweigh the evidence nor judge witness credibility. *Id.* We will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

[19] Indiana Code section 9-30-5-5(a)(2) makes it a Level 4 felony when a person causes the death "of another person" when operating a vehicle with a schedule I or II controlled substance or its metabolite in the person's blood. In relevant part, a "[p]erson" means "an individual." I.C. § 9-13-2-124. The parties agree

that, at least for our purposes, an "individual" must mean that Wilson's child was "viable." Appellant's Br. at 14-16; Appellee's Br. at 13.

[20] Our Court has previously recognized that

> by definition, a viable fetus is an "individual." Indeed, the viability of the fetus proves its status as a separate and distinct entity. . . . [O]ur legislature has defined the term "viability" to mean "the ability of a fetus to live outside the mother's womb." I.C. § 16-18-2-365. A viable fetus is a fetus that *can* live independently from its mother. Thus, our legislature has made it an act of murder for a person to knowingly or intentionally kill a fetus that has attained viability. See Ind. Code § 35-42-1-1(4) [(2005)[4]].

*Horn v. Hendrickson*, 824 N.E.2d 690, 700 (Ind. Ct. App. 2005) (emphasis added; footnote omitted).[5]

---

[4] The current version of Indiana's murder statute, which was also in effect at the time Blackburn committed the instant offenses, defines an act of murder in relevant part to include "knowingly or intentionally kill[ing] a fetus in any stage of development." I.C. § 35-42-1-1(4) (2022).

[5] Whether it is sound policy to correlate personhood with viability is a concern best addressed by our General Assembly. As Judge Mathias explained in his separate opinion to *Horn*:

> Whether the majority wishes to recognize it or not, assigning a viable fetus the status of an "individual" will not be a singular or uniform definition. Rather, the majority's opinion will create a complicated, multi-tiered definition, completely dependent upon the level of care available to the mother and fetus at the time of injury. Will a fetus not be "viable" and therefore not an "individual" if the level of care at the delivery facility is a local county general hospital without appreciable advanced prenatal care? If the same fetus could be viable in a large metropolitan hospital with highly specialized prenatal care, should viability and "individual" status be subject to establishment merely on the chance of location of the place of injury? Will the new standard withstand constitutional scrutiny when the injury occurs in a location where only a lower level of care is available? These are all questions ignored by the majority and that are more properly the province of the General Assembly. These issues should be resolved through proactive public policy debates in the legislative branch of government, rather than through reactive interpretation of statutory language by the judicial branch of government.

[21] The State presented sufficient evidence from which a reasonable fact-finder could conclude that Wilson's child was viable and, thus, an individual. Wilson's husband informed Holderman that Wilson was "5 months pregnant" at the crash scene. Ex. Vol. 1, p. 19. Holderman testified that Wilson appeared to be "twenty weeks pregnant or more." Tr. Vol. 2, p. 147. Likewise, Dr. Hayes testified that the child's growth was "consistent with a child . . . that was somewhere around twenty to twenty-four weeks" of gestational age. *Id.* at 193.

[22] Holderman testified that an unborn child *below* twenty weeks of gestational age is usually considered "a non-viable baby if it is born." *Id.* at 147. Holderman further testified that, "[a]nything *above* twenty weeks, if they are able to get that baby out, then it *does have a chance* of living . . . ." *Id.* (emphases added). Similarly, in his testimony, Dr. Hayes stated that a gestational age of twenty-four weeks or higher comes with "a good chance of survival," with the chances becoming "much less" prior to twenty-four weeks. *Id.* at 193. But Dr. Hayes did not contradict Holderman's testimony that, between twenty and twenty-four weeks of gestational age, the child "ha[s] a chance." *Id.* at 147. Holderman further testified that the hospital to which Wilson was transported had "very good care for premature babies." *Id.*

[23] At that hospital, Dr. Hayes testified that Wilson's unborn child "showed signs of life," namely, "a heartbeat," upon arrival. *Id.* at 192. After concluding that

---

*Horn*, 824 N.E.2d at 704 (Mathias, J., concurring in result). However, as neither party advocates for our Court to apply a different rule, we limit our review to the question of Wilson's child's viability.

an emergency C-section was necessary, Dr. Hayes and his team removed the child from Wilson's womb. There is no dispute that the child was born alive and then died shortly afterward.

[24] A reasonable fact-finder could conclude from that evidence that Wilson's child was viable at the time of the crash. The child was at least twenty weeks gestational age, which came with an undisputed chance of survival outside of the womb. The testimony was equally clear that *nonviability* means a gestational age below twenty weeks. And Wilson was transported to a hospital skilled in the care of premature babies. Thus, the State presented sufficient evidence to show that Wilson's child was an individual under Indiana Code section 9-13-2-124.

[25] Still, the dissent appears to conclude that clinical autopsy evidence or an explicit examination by a physician on a specific fetus's development is required in order for the State to demonstrate that a prematurely born child is an "individual" under Indiana Code section 9-13-2-124. Certainly such evidence would be compelling. But to date, neither our Supreme Court nor the Indiana General Assembly has mandated that such evidence is required in order for a reasonable fact-finder to reach a conclusion on whether a prematurely born child is an "individual" under Indiana Code section 9-13-2-124. Indeed, our General Assembly has elsewhere made clear that it understands "a fetus in any stage of development" to be equivalent to "another human being" for purposes of Indiana criminal law. I.C. § 35-42-1-1(4) (defining murder). Thus, in absence of explicit direction to do otherwise, we apply our usual criminal sufficiency

standard of review here and conclude that the State's evidence was sufficient to show that Wilson's child was an individual. *See, e.g.*, *Meehan v. State,* 7 N.E.3d 255, 258-59 (Ind. 2014).

[26] Finally, we address Blackburn's and the dissent's argument that the evidence is insufficient to support Blackburn's conviction because a child's "chance" at survival invites speculation as to whether the child could in fact live independently of the mother. Appellant's Br. at 15-16. In support of that position, the dissent relies on our opinion in *Patel v. State*, in which we considered the sufficiency of the State's evidence underlying a neglect-of-a-dependent conviction. *Infra* at 15-16 (discussing *Patel v. State*, 60 N.E.3d 1041, 1054 (Ind. Ct. App. 2016)). But, at least as relied upon by the dissent, *Patel* is an opinion on causation, and Blackburn does not argue causation in this appeal— he argues personhood. *See Patel*, 60 N.E.3d at 1052-55. Further, we have elsewhere acknowledged that an unborn child is not within the statutory definition of a "dependent" for our neglect-of-a-dependent statutes. *Herron v. State*, 729 N.E.2d 1008, 1010-11 (Ind. Ct. App. 2000) (*relied on in Patel*, 60 N.E.3d at 1053), *trans. denied*. But the question for Blackburn is not the statutory definition of a "dependent"; it is the statutory definition of an "individual." Indeed, Blackburn's brief to our Court does not rely on neglect-of-a-dependent authority.

[27] Moreover, we conclude that Blackburn and the dissent misunderstand the State's evidence. The difference between viability and nonviability of a prematurely born child is having a chance of survival at all. To date, our best

medical efforts for prematurely born but viable children only affect the odds of survival. *See* Tr. Vol. 2, pp. 147, 192-93. What matters for purposes of Blackburn's conviction is not what the odds here were, but that there was *any* chance of the child's survival at the time of Blackburn's causative criminal conduct. And the evidence was clear and unambiguous that this child had a chance.

[28] We therefore affirm Blackburn's conviction for the death of Wilson's child.

## Conclusion

[29] For all of these reasons, we affirm Blackburn's convictions.

[30] Affirmed.

Felix, J., concurs.
May, J., concurs in part and dissents in part with a separate opinion.

ATTORNEY FOR APPELLANT

Brandon E. Murphy
Cannon Bruns & Murphy
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Courtney Staton
Supervising Deputy Attorney General
Indianapolis, Indiana

**May, Judge, concurring in part and dissenting in part.**

[31] I concur with the majority's determination regarding the admission of evidence, but I cannot concur with the majority's conclusion that the State presented sufficient evidence of probative value to prove beyond a reasonable doubt that Wilson's fetus had attained viability.

[32] The parties and the majority seem to agree the State had an obligation to prove Wilson's fetus had the capability of living independent of Wilson's body. *Slip op.* at para. 19-20. The testimony in this case demonstrated a "theoretical chance of viability" exists for every fetus over twenty weeks of gestation. Because a theoretical chance of viability is not the same as the existence of viability, and because a theoretical chance that an element exists cannot constitute proof beyond a reasonable doubt, I must dissent.

[33] The majority's conclusion is also inconsistent with the legislature's own choices. The legislature defined viability as "the *ability* of a fetus to live outside the mother's womb." Ind. Code § 16-18-2-365 (emphasis added). When the legislature wanted to protect fetuses at any stage of development from criminal liability it said so explicitly – as it did in the murder statute, which defines murder to include knowingly or intentionally killing "a fetus in any stage of development." Ind. Code § 35-42-1-1(4). The legislature chose not to use that language in Indiana Code section 9-30-5-5. That choice is dispositive. The legislature knows how to write a statute that reaches fetuses at any stage of development. When it intends that result it says so, in the text of the statute.

Having chosen not to do so here, the scope of this statute is defined by the language it actually contains – which requires viability, meaning ability – not by reference to a neighboring provision with different language serving a different purpose. Had the legislature used the same formulation in this statute as in the murder statute, there would be no dissent. It did not, and that choice is for the legislature to make, not for this court to override. A theoretical chance of survival is not the ability to live outside the womb, and the legislature's deliberate use of the word *ability* is not an invitation to substitute a lesser standard.

[34] "It is well-settled that proof of guilt beyond a reasonable doubt does not exist where the evidence does no more than . . . establish a possibility or suspicion of guilt." *Wilson v. State*, 455 N.E.2d 1120, 1122 (Ind. 1983) (citing *Briscoe v. State*, 388 N.E.2d 638 (Ind. Ct. App. 1979)). In *Briscoe*, our court held a "nonexclusive opportunity to commit the crime" is not enough to support of a conviction because it demonstrates only a possibility. *Briscoe*, 388 N.E.2d at 645. A theoretical chance of survival is similarly just a possibility of viability. The majority's holding that a theoretical chance of survival constitutes proof of viability beyond a reasonable doubt is irreconcilable with *Briscoe*, which the majority does not cite and does not address. We similarly held that medical testimony establishing only a possibility that an element exists is insufficient to prove that element beyond a reasonable doubt in *Patel v. State*, 60 N.E.3d 1041, 1054 (Ind. Ct. App. 2016). Although the majority distinguishes *Patel* as a causation case, the underlying principle is not element-specific. The rule of law

stated in *Wilson* applies without limitation to the type of element at issue: a possibility does not prove an element beyond a reasonable doubt. The majority offers no authority for the position that possibility-level evidence is insufficient for causation but sufficient for personhood, and caselaw forecloses that distinction.

[35] Because the State did not prove beyond a reasonable doubt that Wilson's fetus had the ability to live outside the mother's womb – as opposed to a theoretical chance of doing so – I cannot vote to affirm Blackburn's Level 4 felony conviction on Count 3. I respectfully dissent.[6]

---

[6] I would reverse the Level 4 felony conviction on Count 3 and remand with instructions to enter the Level 5 felony involuntary manslaughter conviction on Count 4, on which the jury also found Blackburn guilty. *See* I.C. § 35-42-1-4(c)(4) (defining involuntary manslaughter to include killing a fetus while operating a motor vehicle while intoxicated). The legislature specifically created that statute for precisely this conduct. The State proved that offense beyond a reasonable doubt and neither party disputes it.